# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

GIBSON GUITAR CORP.,

           *Plaintiff-Appellee,*

v.

PAUL REED SMITH GUITARS, LP,

           *Defendant-Appellant.*

Nos. 04-5836/5837

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 00-01079—William J. Haynes, Jr., District Judge.

Argued: December 10, 2004

Decided and Filed: September 12, 2005

Before: KENNEDY, MARTIN, and MOORE, Circuit Judges.

---

## COUNSEL

**ARGUED:** William D. Coston, VENABLE LLP, Washington, D.C., for Appellant. John F. Triggs, GREENBERG TRAURIG, New York, New York, for Appellee. **ON BRIEF:** William D. Coston, Kevin B. Collins, VENABLE LLP, Washington, D.C., for Appellant. John F. Triggs, GREENBERG TRAURIG, New York, New York, David A. Kessler, GREENBERG TRAURIG, McLean, Virginia, Edward D. Lanquist, Jr., WADDEY & PATTERSON, Nashville, Tennessee, for Appellee.

MOORE, J., delivered the opinion of the court, in which MARTIN, J., joined. KENNEDY, J. (pp. 12-14), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

KAREN NELSON MOORE, Circuit Judge. This is an interlocutory appeal of an injunction granted in a trademark case. The parties agree that the mark purports to include at least the two-dimensional guitar shape set out in the trademark-registration papers. However, they disagree as to whether the mark extends to cover three-dimensional objects where two dimensions of those objects have the same general shape (but not the same exact proportions) as the drawing in the registration papers, and as to whether the mark includes additional product features shown in a photograph

1

accompanying the registration papers.[1] Whatever the scope of the mark, the parties also dispute whether the mark is valid and whether it has been infringed.

Plaintiff-Appellee Gibson Guitar Corp. ("Gibson") is the owner of the mark in question, U.S. Trademark Registration No. 1,782,606 (the "LP Trademark"). Defendant-Appellant Paul Reed Smith Guitars, LP ("PRS") manufactures the "Singlecut" line of guitars which Gibson alleges infringes on the LP Trademark. Concluding that there was no issue of fact for trial, the district court granted summary judgment in favor of Gibson on the trademark-infringement claim, denied all of PRS's counterclaims, and issued a permanent injunction preventing PRS from manufacturing, selling, or distributing its Singlecut line guitars.

With respect to Gibson's trademark-infringement claim, we **REVERSE** the district court's decision granting summary judgment in favor of Gibson, **REVERSE** the district court's decision denying summary judgment in favor of PRS, and **VACATE** the permanent injunction issued by the district court. We **REMAND** the case to the district court with instructions that summary judgment be entered in favor of PRS on Gibson's trademark-infringement claim.[2]

## I. BACKGROUND

### A. Facts

Certain basic facts are not in dispute. Gibson and PRS both manufacture high-quality guitars. Gibson has been in the business of manufacturing musical instruments for over 100 years. PRS founder Paul Reed Smith ("Smith") began manufacturing custom guitars in the mid-1970s and opened a guitar factory in 1985.

Gibson introduced at least one guitar model under the Les Paul name in 1952. Since that time, Gibson has offered a number of guitar models under the Les Paul name. At least some of these models were solid-body, single-cutaway electric guitars of the type at issue in this litigation.[3] For

---

[1] We emphasize that this dispute is only over whether the product shape and features are covered by trademark law. All trade-dress claims have been voluntarily dismissed by the parties.

[2] On appeal, Defendant-Appellant Paul Reed Smith Guitars, LP ("PRS") also maintains that the district court erred in failing to declare Trademark Registration No. 1,782,606 (the "LP Trademark") invalid under the doctrines prohibiting protection of functional or generic marks. As we have determined that the LP Trademark, even if valid, is not infringed by the PRS Singlecut, we **DENY** PRS's counterclaims against the validity of the trademark **AS MOOT**. We also note that following oral argument and prior to our decision in this case, PRS filed a motion to stay proceedings in the district court pending the resolution of this appeal. We now **DENY** this motion **AS MOOT**.

[3] On appeal, neither party challenges the district court's description of the Les Paul single-cutaway guitar produced by Plaintiff-Appellee Gibson Guitar Corp. ("Gibson"):
> Gibson's Les Paul single cutaway guitar is a traditionally shaped guitar with a portion removed from [the] body of the guitar where the lower section of the fingerboard meets the body of the guitar. The term "cutaway guitar" denotes that portion of the guitar between the neck and its lower[] part, that appears to be missing from the natural, rounded body contour. The removal of this portion forms what is often referred to as the "horn." One aspect of this horn design is that the musician can access higher strings [and] position[s].
>
> As to other parts of a guitar, a pickup selector switch allows the player to change quickly the electromagnetic inputs to any one of three options: the pickup closest to the neck (the "neck pickup"), the one furthest from the neck (the "bridge pickup"), or a combination of both. The combination of volume and tone knobs for each pickup[] allow[s] the player to set the tone and volume of each pickup and[] switching among these pickups can achieve different sounds.

*Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 311 F. Supp. 2d 690, 694-95 (M.D. Tenn. 2004) ("*Gibson I*") (quotation marks, citations, and footnote omitted).

a number of years during the 1960s, Gibson did not manufacture guitars in the Les Paul series. At some time thereafter, Gibson resumed manufacturing solid-body, single-cutaway electric guitars under the Les Paul name. Gibson first applied for registration of what became the LP Trademark — the mark under which Gibson asserts trademark protection for its Les Paul line of solid-body, single-cutaway electric guitars — on July 29, 1987, but the U.S. Patent and Trademark Office did not issue the registration until July 20, 1993. On September 27, 1999, the LP Trademark became "incontestable" within the meaning of 15 U.S.C. §§ 1065 and 1115(b).

PRS is a relatively recent entrant to the solid-body, single-cutaway electric-guitar market. Although PRS had previously manufactured a number of other guitars, it did not offer a single-cutaway guitar in its normal line until January 2000 at the earliest. In February 2000, PRS displayed models of the PRS Singlecut, a solid-body, single-cutaway electric guitar, at a music industry trade show.[4] On March 27, 2000, Gibson sent a letter demanding that PRS cease and desist from producing and selling the Singlecut.

## B. Procedural History

The procedural posture of this case is somewhat unusual. We briefly summarize those aspects relevant to this interlocutory appeal. On November 6, 2000, Gibson sued PRS in federal district court in Nashville, Tennessee. The complaint sought injunctive relief, costs, attorney fees, and treble damages for trademark infringement, counterfeiting, false designation of origin, and dilution under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), 1125(c), and for unfair competition, fraud, and deceptive business practices under state law. PRS counterclaimed, seeking declaratory and injunctive relief and asserting that: (1) the LP Trademark is invalid and unenforceable; (2) the LP Trademark is not infringed by the PRS Singlecut; (3) any trade dress associated with the Gibson Les Paul series of guitars cannot be protected under the Lanham Act or is otherwise unenforceable; and (4) the PRS Singlecut guitar does not infringe any such trade dress.

PRS moved for summary judgment on all claims and counterclaims, and Gibson moved for partial summary judgment on the trademark-infringement claim. On January 22, 2004, the district court granted Gibson's motion for partial summary judgment on its trademark-infringement claim and denied PRS's motion for summary judgment in its entirety. *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 311 F. Supp. 2d 690, 725 (M.D. Tenn. 2004) ("*Gibson I*"). After the district court's summary judgment decision, the parties jointly requested that the district court allow them to: (1) amend Gibson's complaint to state only the trademark-infringement claim; (2) amend PRS's answer to state only trademark-related counterclaims; and (3) dismiss all other claims and counterclaims with prejudice. The district court approved this request, and shortly thereafter Gibson filed an amended complaint and PRS filed an amended answer. As amended, Gibson's complaint seeks injunctive relief, attorney fees, and treble damages for infringement of the LP Trademark. PRS's amended counterclaim seeks declaratory and injunctive relief, costs, and attorney fees, on the basis that the LP Trademark is invalid and unenforceable and that the LP Trademark is not infringed by the PRS Singlecut.

On July 2, 2004, the district court issued an order addressing a motion in limine filed by Gibson and several matters raised in PRS's pretrial brief, including a demand by PRS for a jury trial on the amount of profits to be disgorged. In the course of ruling on Gibson's motion in limine and denying PRS's jury trial demand, the district court entered a permanent injunction against PRS:

---

[4] The PRS Singlecut includes numerous source-indicating features, including "the PRS headstock, logo, fretboard inlay, three-dimensional 'scoop' carve in the cutaway which indicates manufacture by PRS, and hanging tags attached to the guitar at shipment and used at point of sale." Joint Appendix ("J.A.") at 1163 (PRS Reply to Gibson Response to PRS Statement of Undisputed Facts).

> This is hereby ORDERED that the Defendant Paul Reed Smith, its partners, employees, agents and all persons in active consent with them are ENJOINED from manufacturing, selling, or distributing, or in any manner[] enabling or aiding others to manufacture, or to sell, or to distribute the PRS Singlecut guitar and all versions thereof, including but not limited to their exterior shapes and features, the designs of which have been determined to violate Plaintiff's rights to protection under the Lanham Act for its incontestable trademark registration, No. 1,782,606 for Les Paul guitar.

*Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 325 F. Supp. 2d 841, 855 (M.D. Tenn. 2004) ("*Gibson II*").[5] The district court's order explicitly reserved decision on all other issues remaining in the case pending a hearing on disgorgement of profits.[6] In this interlocutory appeal, PRS challenges the July 2, 2004 injunction and the January 22, 2004 order granting partial summary judgment to Gibson and denying summary judgment to PRS.

## II. ANALYSIS

### A. Jurisdiction

The district court had jurisdiction over the underlying action pursuant to the Lanham Act, 15 U.S.C. § 1114. As the district court entered a permanent injunction against PRS, we have jurisdiction to hear this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1). Although our jurisdiction arises from PRS's interlocutory appeal of the permanent injunction entered below, we may also review the district court's summary judgment rulings because those rulings form the basis for the district court's decision to order injunctive relief.[7]

### B. Propriety of Granting Injunctive Relief

In determining whether a district court has properly granted a permanent injunction, we review factual findings for clear error, legal conclusions de novo, and the scope of injunctive relief for abuse of discretion. *Worldwide Basketball and Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004). A district court normally must hold an evidentiary hearing prior to issuing a permanent injunction. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1174

---

[5] Explaining its decision to issue an injunction prior to the trial on appropriate relief, the district court noted:
> Here, the Court did not initially award injunctive relief in contemplation of a motion to alter or amend its earlier findings and conclusions of law for potential error. The Court was of the view that the declaration of rights was sufficient in the interim. PRS did not file a Rule 59 motion or a motion to reconsider. The Court is now firmly convinced that injunctive relief to bar the production and sale of PRS's Singlecut is appropriate and necessary.
>
> As to any stay pending an appeal, the standards to consider are those on awarding injunctive relief. For the reasons set forth in the Court's Memorandum, the Court does not believe that PRS will prevail on appeal. Gibson will suffer irreparable injury to its goodwill in its Les Paul[] if PRS is not enjoined. Gibson's dealers would be injured by PRS's unlawful sales of its Singlecut. The Court deems it in the interest of justice to enforce registered trademarks. Given these findings, PRS's request for a stay of injunctive relief will be denied.

*Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 325 F. Supp. 2d 841, 854 (M.D. Tenn. 2004) ("*Gibson II*").

[6] A bench trial was held from July 6, 2004 to July 7, 2004. Perhaps awaiting the result of this interlocutory appeal, the district court does not appear to have issued any order following this bench trial.

[7] *See Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 756-57 (1986), *overruled on other grounds by Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992)); *United States v. Michigan*, 940 F.2d 143, 151-52 (6th Cir.), *cert. denied*, 513 U.S. 925 (1991); *see also* 16 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3921.1, 3924 (1996 & Supp. 2005).

(6th Cir. 1995). In this case, it is unclear from the parties' submissions whether the district court held an evidentiary hearing prior to issuing the permanent injunction. However, because an evidentiary hearing is not required when "no factual issues remain for trial," *id.*, the district court's decision to grant a permanent injunction without such a hearing could still be upheld if the entry of summary judgment in favor of Gibson and against PRS was proper. Accordingly, resolution of PRS's interlocutory appeal from the permanent injunction requires us to determine whether summary judgment was properly granted to Gibson. We conclude that it was not, and the district court accordingly erred in granting a permanent injunction.

Summary judgment should be granted whenever "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). On a motion for summary judgment in a trademark-infringement case, we conduct de novo review of both (1) the district court's determination of what material facts are in dispute; and (2) the legal conclusions the district court drew from the undisputed facts. *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 422 (6th Cir. 1999). In conducting this review of a summary judgment motion, we draw all reasonable inferences in favor of the party opposing the motion. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).

### C. The Scope of the LP Trademark

Prior to conducting our substantive inquiry, we take this opportunity to clarify a fundamental issue. The district court appears to have confused *trademark law* and *trade-dress law* when it concluded that the LP Trademark covered the entire guitar, rather than the two-dimensional silhouette included in the registration papers, *Gibson I*, 311 F. Supp. 2d at 719; *see also Gibson II*, 325 F. Supp. 2d at 852. This affected the remainder of the district court's reasoning and prevented proper analysis of the parties' claims. Specifically, we do not believe that the two-dimensional drawing included in the LP Trademark should be construed to create a trademark on the entire guitar as depicted in photographs accompanying the trademark application (including the location and style of knobs, switches, and other hardware).[8]

The district court's error rests on an overly broad reading of *In re ECCS, Inc.*, 94 F.3d 1578, 1581 (Fed. Cir. 1996).[9] As PRS correctly argues, the district court relies on *ECCS* to justify its

---

[8] The district court's analysis of this issue reads in full:
The Court follows [*In re ECCS, Inc.*, 94 F.3d 1578, 1581 (Fed. Cir. 1996)] to conclude that any variations between Gibson's drawings and the Les Paul guitar are not controlling. The core consideration is whether the Les Paul guitar is covered by Gibson's trademark. Here, the undisputed facts are that the Gibson's Les Paul guitar is the same shape of the guitar shown in Gibson's trademark and application papers. Pictures of the Les Paul guitar, as well as pictures from market publications and business records about the Les Paul guitar were part of Gibson's application papers upon which the USTPO issued Gibson's trademark registrations. The Court concludes PRS's contention about . . . Gibson's drawing lacks merit[.]
*Gibson I*, 311 F. Supp. 2d at 719; *see also Gibson II*, 325 F. Supp. 2d at 849 ("Elements of the Les Paul are so intermingled with PRS's Singlecut that the *entire* Singlecut guitar is the offending product."); *id.* at 852 ("Finally, Gibson's trade mark is not, as PRS argues, the two dimensional guitar, but rather is the entire Les Paul guitar and its appearance.").

[9] The issue presented in *ECCS* was entirely different from the one presented by the LP Trademark. In *ECCS*, the Federal Circuit was called to determine whether to permit a trademark applicant to amend an admittedly erroneous drawing to conform to its intended trademark, rather than require the trademark be changed to conform to the erroneous drawing. The *ECCS* trademark applicant had submitted accurate "specimens" of its trademark, as actually used (the word "EXA" appearing above the word "MODULE"), but had included an inaccurate "drawing" of the trademark (listing "EXAMODULE" as a single word, on a single line). *ECCS*, 94 F.3d at 1581. The applicant attempted to submit a corrected drawing, but the trademark examining attorney, in a decision upheld by the Trademark Trial and Appeals Board, required that the applicant instead submit substitute specimens reflecting use of the mark in the drawing

decision to expand Gibson's *trademark* on the guitar's body shape to cover other aspects or design features of the guitar (such as the placement and style of knobs and switches, and the color of the guitar) which would normally qualify as *trade dress*. However, trademark and trade dress are two distinct concepts under the Lanham Act. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209-210 (2000). The Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof" which is used or intended to be used by a person "in commerce . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. By contrast, trade dress is not explicitly defined in the Lanham Act, but has been described by the Supreme Court as the "design or packaging of a product" which has acquired a "secondary meaning" sufficient "to identify the product with its manufacturer or source." *Traffix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001).[10]

### D. Trademark Infringement Under the Lanham Act

To establish trademark infringement within the meaning of the Lanham Act, Gibson must demonstrate that the PRS Singlecut "is likely to cause confusion among consumers regarding the origin [of the Singlecut]." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) (citing 15 U.S.C. § 1114). We determine whether such confusion is likely by examining the eight *Frisch* factors: (1) "strength of the plaintiff's mark," (2) "relatedness of the goods or services," (3) "similarity of the marks," (4) "evidence of actual confusion," (5) "marketing channels used," (6) "likely degree of purchaser care," (7) "the defendant's intent in selecting its mark," and (8) "likelihood of expansion of the product lines." *Jet*, 165 F.3d at 422 (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.), *cert. denied*, 459 U.S. 916 (1982)).[11] In conducting the *Frisch* balancing test, we must remember that

---

("EXAMODULE"). The Federal Circuit reversed the Board's decision, holding that in such a case it is appropriate to look to the specimens to determine what the applicant wished to register, rather than "a clearly inconsistent and erroneous drawing made by its attorney." *Id.*

[10] *See generally* 15 U.S.C. § 1125(a); *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209-210 (2000) (describing trade dress protection); *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629-30 (6th Cir. 2002) (same). As we have explained,

> [t]rade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, [that] make[s] the source of the product distinguishable from another and . . . promote[s] its sale. Trade dress involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.

*Abercrombie*, 280 F.3d at 629 (internal quotations omitted) (brackets and ellipses in *Abercrombie*). The distinction between trademark and trade dress is particularly important, given the posture of this case. As we noted above, after the district court granted Gibson's partial summary judgment motion, the district court approved the parties' agreement to dismiss *with prejudice* all of Gibson's remaining claims, including its claim for trade-dress infringement. Accordingly, the only remaining Gibson claim is the § 1114(1)(a) trademark-infringement claim.

[11] Many precedents applying this test arise out of bench trials, where the district court has the authority to make findings of fact, *see, e.g.*, *Wynn Oil Co. v. Thomas*, 839 F.2d 1183 (6th Cir. 1988). However, we have previously explained the somewhat awkward manner in which this test should be applied in the context of a summary judgment motion:

> This Circuit considers the question of whether there is a likelihood of confusion a mixed question of fact and law. Factual findings must be made with respect to the likelihood of confusion factors set out above. However, the further determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion. Because this case is presented to us after a grant of summary judgment, our task is to determine whether the District Court correctly held that no genuine issues of material fact were presented regarding the likelihood of confusion factors.
>
> To resist summary judgment in a case where the likelihood of confusion is the dispositive issue, a nonmoving party must establish, through pleadings, depositions, answers to interrogatories,

"[t]hese factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991).

The district court concluded that, with the exception of actual confusion (factor four), all factors on which it made a finding favored Gibson for summary judgment purposes.[12] Because there was no evidence of point-of-sale confusion, factor four would have favored PRS. *Gibson I*, 311 F. Supp. 2d at 709-10, 723. However, the district court nonetheless concluded that "[g]iven the striking similarity of the PRS Singlecut to Gibson's Les Paul and the instant market recognition of Gibson's Les Paul . . . initial confusion would occur in the marketplace between parties' products as to the 'Singlecut' guitar's source. This factor favors Gibson." *Gibson I*, 311 F. Supp. 2d at 724. Having made this substitution of "initial confusion" for actual confusion at the point of sale, the district court went on to determine that summary judgment in favor of Gibson was appropriate on Gibson's claim that the PRS Singlecut infringed the LP Trademark. We disagree with the district court's conclusion that "initial confusion" (or, as discussed below, any of its variants) can apply in this case. Moreover, as Gibson has conceded that no purchaser would be confused at the point of sale,[13] we conclude that there is no theory of confusion upon which Gibson can prevail. In other words, Gibson's concession that there is no point-of-sale confusion (which goes to the fourth *Frisch* factor, actual confusion) is dispositive of Gibson's claim.[14] Accordingly, it is not necessary for us to discuss the remaining seven *Frisch* factors.

### 1. Gibson's Theories of Purchaser Confusion

Gibson argues that despite the lack of actual confusion at the point of sale, the district court's decision can be affirmed under a theory of either initial-interest confusion (the theory relied on by the district court), post-sale confusion, or some combination of the two. Initial-interest confusion takes place when a manufacturer improperly uses a trademark to create initial customer interest in a product, even if the customer realizes, prior to purchase, that the product was not actually manufactured by the trademark-holder. *See PACCAR Inc. v. Telescan Techs., L.L.C.*, 319 F.3d 243, 253 (6th Cir. 2003); *see also* J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR

---

admissions and affidavits in the record, that there are genuine factual disputes concerning those of the *Frisch's* factors which may be material in the context of the specific case.
*Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991).

[12] We disagree with several of the district court's conclusions on the individual *Frisch* factors. However, as these remaining factors are not relevant to our disposition of this case, we need not discuss them separately.

[13] *See* Oral Argument Tape, Argument of Behalf of Gibson ("You're dealing with, you're absolutely right, very sophisticated consumers here. They're sophisticated both at the, at looking for that shape, and they're sophisticated when they buy this. There's no question when they buy this [i.e., either a PRS Singlecut or a Gibson Les Paul], you'd have to be an idiot not to know which guitar you're buying. There's labels on it, hang tags, you pay $3000, we understand that."); *see also* Gibson Br. at 15 ("To issue an exemption [from trademark limitations] to PRS for deliberately violating Gibson's trademark simply because at the point of sale the consumer knows he is buying a 'PRS Les Paul' makes a mockery of trademark protection."); *id.* at 24. ("In any case, there is no genuine issue of material fact that PRS's conduct causes harm, i.e., confusion, in the marketplace. The confusion is simply not at the point of sale."); *id.* at 41 ("Instead, PRS wants the Court to find that the confusion that occurred was not at the point of sale, and is thus of no consequence."); *id.* at 45 ("The expense of the guitar and the degree of savvy of the consumer will likely avoid confusion at the point of sale but will not avoid initial interest confusion.").

[14] The dissent maintains that Gibson's concession goes to the ultimate issue of likelihood of confusion, rather than to the fourth factor of the *Frisch* test. *See* Dissent at 12, nn.1-2. Although we conclude that the concession is best understood as going to an individual factor, rather than the ultimate issue, we note that even if we were to adopt the dissent's position on this point, it would not lead us to a different result.

COMPETITION § 23:6 (4th ed. 1996 & Supp. 2005) ("MCCARTHY ON TRADEMARKS") (collecting cases). Post-sale confusion occurs when use of a trademark leads individuals (other than the purchaser) mistakenly to believe that a product was manufactured by the trademark-holder. *See Esercizio v. Roberts*, 944 F.2d 1235, 1245 (6th Cir. 1991), *cert. denied*, 505 U.S. 1219 (1992); *see also* MCCARTHY ON TRADEMARKS § 23:7 (collecting cases). We conclude that neither initial-interest confusion, nor post-sale confusion, nor any combination of two, is applicable in this case.

### a. Initial-Interest Confusion

The one case where we arguably have applied initial-interest confusion involved facts strikingly different than those involved in the present dispute. In *PACCAR*, we were faced with a dispute between Telescan, a company operating used-truck-locator web sites, and PACCAR, a truck manufacturer which also operated its own used-truck-locator website. In *PACCAR*, Telescan was using trademarks owned by PACCAR as part of the domain name of some of its used-truck-locator web sites. Noting that "[a]n infringing domain name has the potential to misdirect consumers as they search for web sites associated with the owner of a trademark," we suggested that initial-interest confusion analysis might appropriately be applied. *PACCAR*, 319 F.3d at 253. However, our decision that PACCAR had established a likelihood of success on the merits on the likelihood-of-confusion issue did not rest on initial-interest confusion.[15]    Instead,

---

[15] The dissent reads far too much into our discussion of initial-interest confusion in *PACCAR Inc. v. Telescan Techs., L.L.C.*, 319 F.3d 243, 253 (6th Cir. 2003), which is specifically in reference to a dispute over Internet domain-names:

> TeleScan also contends that the district court erred in discounting the disclaimer included on its web sites. The district court found that TeleScan's disclaimer does not remedy the confusion caused by the use of PACCAR's trademarks in its domain names. *An infringing domain name has the potential to misdirect consumers as they search for web sites associated with the owner of a trademark. A disclaimer disavowing affiliation with the trademark owner read by a consumer after reaching the web site comes too late.* This "initial interest confusion" is recognized as an infringement under the Lanham Act.

*Id.* at 253 (emphasis added). The three cases we cited in support of the initial-interest-confusion comment in *PACCAR* are also Internet cases. *See id.* (citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000) (Internet sale of herbal products intended as alternatives to well-known prescription medications, using names for the herbal products confusingly similar to those of the prescription medications); *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999) (use of trademark "moviebuff.com" in metatags of a competitor's website); *Green Prods. Co. v. Independence Corn By-Products Co.*, 992 F. Supp. 1070 (N.D. Ia. 1997) (registration of website domain name confusingly similar to competitor's trademarked name)). Our suggestion that initial-interest-confusion doctrine applies to disputes over Internet domain names does not mean (as the dissent seems suggest) that "initial interest confusion is a recognized theory of relief generally for [all types of] trademark infringements." Dissent at 12.

To the contrary, the applicability of the initial-interest-confusion doctrine outside of the Internet context is an issue of first impression in our circuit. Although other circuits have applied the initial-interest-confusion doctrine to find trademark infringement based on use of a deliberately deceptive name or logo, *see, e.g., Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975), we are not aware of any circuit that has applied the initial-interest-confusion doctrine to a trademark on a product's shape.

The potential ramifications of applying this judicially created doctrine to product-shape trademarks are different from the ramifications of applying the doctrine to trademarks on a product's name, a company's name, or a company's logo. *Cf. Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 201-03, 207, 209, 212-13, 215 (3rd Cir. 1995) (discussing the related context of product-configuration trade dress). Specifically, there are only a limited number of shapes in which many products can be made. A product may have a shape which is neither functional nor generic (and hence which can be trademarked) but nonetheless is still likely to resemble a competing product when viewed from the far end of a store aisle. Thus, many legitimately competing product shapes are likely to create some initial interest in the competing product due to the competing product's resemblance to the better-known product when viewed from afar. In other words, application of the initial-interest-confusion doctrine to product shapes would allow trademark holders to protect not only the actual product shapes they have trademarked, but also a "penumbra" of more or less similar shapes that would not otherwise qualify for trademark protection.

In response, the dissent suggests that product-shape trademark-holders be required to demonstrate "that its

we focused primarily on three other *Frisch* factors that we judged to be particularly important in an Internet-domain-name case. *See id.* at 254-55. As always, our concern was with "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Id.* at 249 (quotations omitted). Other circuits applying the initial-interest confusion doctrine have generally focused on that same issue: whether the consumer might be misled about the source of the relevant product or service.[16]

Gibson essentially argues that the shape of the PRS guitar leads consumers standing on the far side of the room in a guitar store to believe they see Gibson guitars and walk over to examine what they soon realize are PRS guitars. *See, e.g.*, J.A. at 1451 (Carter Dep.) ("Just looking at the guitars on the wall, I initially thought I was looking at Les Pauls, and[] on a closer look, I saw I wasn't."). We decline to adopt such a broad reading of the initial-interest-confusion doctrine. Many, if not most, consumer products will tend to appear like their competitors at a sufficient distance. Where product shapes themselves are trademarked,[17] such a theory would prevent competitors from

---

product shape identifies its source when viewed from the vantage point where the confusion is alleged to have occurred" prior to presenting evidence of initial-interest confusion. Dissent at 13. This strikes us as a needlessly complicated and unworkable inquiry. Particularly when the product is sold by many diverse retailers with varying display styles and store configurations, it would seem to require the district court to conduct an initial hearing as to whether each instance of alleged initial-interest confusion is admissible. As consumers will often observe a product from multiple different locations, it seems difficult to determine in any non-arbitrary manner what observation distances are appropriate when considering whether a given product shape creates initial-interest confusion (e.g., in front of the product shelf, from a store aisle, from the store's front door, etc.).

Finally, our concerns about the effect of extending the initial-interest-confusion doctrine to product-shape trademarks are particularly relevant in the summary-judgment context. To the extent we allow it to do so, evidence of initial-interest confusion comes into the eight-factor *Frisch* test as a substitute for evidence of actual confusion. If our belief that *nearly all* product-shape trademark-holders will be able to show an issue of fact as to whether a competing product creates initial-interest confusion is correct, application of the initial-interest-confusion doctrine in the product-shape context would make it substantially easier for product-shape trademark-holders to survive a defendant's summary-judgment motion than for plaintiffs alleging any other type of trademark infringement. (Contrary to the dissent's view, *see* Dissent at 14 n.7, product-shape trademark-holders are perfectly capable of protecting their rights without the initial-interest-confusion doctrine: they must simply show, for example, that the marks are sufficiently similar or that purchasers exercise sufficiently little care in choosing a product to show confusion at the point of sale). Given severe anti-competitive effects such a decision could have, we do not believe it is appropriate to extend the initial-interest-confusion doctrine in this manner.

Given the limited fact situation we have before us, we do *not* go so far as to hold that there is *never* a circumstance in which it would be appropriate to apply the initial-interest-confusion doctrine to a product-shape trademark. However, we are unable to imagine such a situation at this juncture, and we do hold that the doctrine cannot apply on the facts of this case.

[16] *See, e.g., Playboy Enters., Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1024-26 (9th Cir. 2004) (finding a likelihood of initial-interest confusion when survey results showed that many individuals running Internet searches for trademarked terms would incorrectly believe that banner ads run by competitors were sponsored by or affiliated with the trademark owner); *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 204 (5th Cir. 1998) (applying initial-interest-confusion analysis to find trademark infringement by nightclub operating under the name, "The Velvet Elvis," because confusion over whether the club was associated with Elvis Presley could "bring[] patrons in the door"); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987) (approving district court finding of actual confusion based on "the likelihood that Pegasus Petroleum would gain crucial credibility in the initial phases of a deal" by using mark confusingly similar to Mobil's flying horse); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975) (concluding that company manufacturing pianos under the name "Grotrian-Steinweg" could be found to be infringing the "Steinway" trademark because of "the likelihood that a consumer, hearing the 'Grotrian-Steinweg' name and thinking it had some connection with 'Steinway', would consider it on that basis"). *But see Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999) (concluding that use of the trademark "MovieBuff" in metatags of a competitor's website resulted in a likelihood of initial-interest confusion even without confusion as to source).

[17] We express no opinion on the extent to which trademark law can properly apply to product shapes. *Cf. Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 172-73 (1995).

producing even *dissimilar* products which might appear, from the far end of an aisle in a warehouse store, somewhat similar to a trademarked shape. Accordingly, we hold that initial-interest confusion cannot substitute for point-of-sale confusion on the facts of this case.

### b. Post-Sale Confusion

The one published case where we have applied post-sale confusion is also clearly distinguishable from the present case. *Esercizio*, a trade-dress case, involved Ferrari sports cars which were manufactured in deliberately limited quantities "in order to create an image of exclusivity." *Esercizio*, 944 F.2d at 1237. The alleged infringer built fiberglass kits intended to be "bolted onto the undercarriage of another automobile such as a Chevrolet Corvette or a Pontiac Fiero" in order to make the "donor car" look like a far-more-expensive Ferrari. *Id.* at 1238. Our concern in *Esercizio* was that "Ferrari's reputation in the field could be damaged by the marketing of Roberts' [clearly inferior] replicas." *Id.* at 1245. Such a concern is not present here, where Gibson concedes that PRS guitars are not clearly inferior to Gibson guitars. *See, e.g.*, Gibson Br. at 5, 23. Accordingly, post-sale confusion cannot serve as a substitute for point-of-sale confusion in this case.

### c. Gibson's Smoky-Bar Theory of Confusion

Finally, Gibson argues that, taken together, the initial-interest-confusion and post-sale-confusion doctrines should be extended to include something that we can only describe as a "smoky-bar theory of confusion." Initial-interest-confusion doctrine, which we have already rejected on the facts of this case, applies when allegedly improper use of a trademark attracts potential purchasers to consider products or services provided by the infringer. Post-sale-confusion doctrine, which we have also rejected on the facts of this case, applies when allegedly improper use of protected trade dress on a lower-quality product diminishes the reputation of the holder of the rights to that trade dress.[18] In the smoky-bar context, however, Gibson does not suggest that consumer confusion as to the manufacturer of a PRS guitar would lead a potential purchaser to consider purchasing a PRS, rather than a Gibson, or that Gibson's reputation is harmed by poor-quality PRS guitars. Rather, Gibson argues that this confusion occurs when potential purchasers see a musician playing a PRS guitar and believe it to be a Gibson guitar:

> In the context of guitar sales, initial interest confusion is of real consequence. Guitar manufacturers know that they can make sales by placing their guitars in the hands of famous musicians. On a distant stage, a smoky bar, wannabe musicians see their heroes playing a guitar they then want.

Gibson Br. at 20-21. As Gibson concedes that PRS produces high-quality guitars, we do not believe such an occurrence could result in confusion harmful to Gibson. If a budding musician sees an individual he or she admires playing a PRS guitar, but believes it to be a Gibson guitar, the logical result would be that the budding musician would go out and purchase a Gibson guitar. Gibson is helped, rather than harmed, by any such confusion.

---

[18] As post-sale confusion clearly does not apply in this case, we need not decide whether it can ever be properly applied in the context of a trademark claim, rather than trade-dress claim.

### 2. The Summary Judgment Motions

We have determined as a matter of law that initial-interest confusion, post-sale confusion, and Gibson's "smoky-bar theory of confusion" cannot be used to demonstrate infringement of the trademark at issue in this case. Gibson has conceded that point-of-sale confusion does not occur between these high-priced guitars, and our review of the record does not suggest otherwise. Accordingly, there is simply no basis on which Gibson can show confusion that would demonstrate trademark infringement in violation of the Lanham Act. *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 125 S. Ct. 542, 547 (2004) (noting that a claim of trademark infringement under the Lanham Act "requires a showing that the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question"). Accordingly, PRS, rather than Gibson, must be granted summary judgment on Gibson's trademark-infringement claim.

### III. CONCLUSION

With respect to Gibson's trademark-infringement claim, we **REVERSE** the district court's decision granting summary judgment in favor of Gibson, **REVERSE** the district court's decision denying summary judgment in favor of PRS, and **VACATE** the permanent injunction issued by the district court. We **DENY** all other claims and motions **AS MOOT**, and **REMAND** the case to the district court with instructions that summary judgment be entered in favor of PRS on Gibson's trademark-infringement claim.

## CONCURRING IN PART, DISSENTING IN PART

KENNEDY, Circuit Judge, concurring in part and dissenting in part. I agree that the district court erred in granting summary judgment in favor of Gibson and I also agree that Gibson cannot maintain its trademark infringement claim either on a theory of likelihood of confusion at the point-of-sale (for it has disclaimed that a consumer could be confused at the point-of-sale)[1] or on a theory of post-sale confusion.[2] However, because I believe that a product shape trademark holder should be able to present evidence to maintain a trademark infringement claim on the theory of initial-interest confusion, I dissent with respect to this issue.

First, this court has recognized initial-interest confusion as an infringement under the Lanham Act. *See PACCAR Inc., v. Telescan Technologies, L.L.C.*, 319 F.3d 243, 253 (6th Cir. 2003) (citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000) ("Such confusion, which is actionable as an infringement under the Lanham Act, occurs when a consumer is lured to a product by its similarity to a known mark, even though the consumer realizes the true identity and origin of the product before consummating a purchase.")).[3] Second, a product shape can serve as a trademark, i.e. it can identify the source of the product. *See Qualitex Co. v. Jacobsen Products Co., Inc.*, 514 U.S. 159, 172-73 (1995) (recognizing that the Senate Report accompanying the Lanham act revision of 1988 stated that the "revised definition intentionally retains . . . the words 'symbol' or 'device' so as not to preclude the registration of colors, shapes, sounds or configurations where they function as trademarks.") (citation omitted and ellipsis in original); *see also Kohler Co., v. Moen Inc.*, 12 F.3d 632, 636 (7th Cir. 1993) (concluding, in a case involving faucet manufacturer, which received a trademark after demonstrating that "purchasers of its products recognized the source of its faucets by their distinctive shapes," that product configurations were entitled to trademark protection). Since a product shape can serve as a trademark, and since initial interest confusion is a recognized theory of relief generally for trademark infringements, I believe that a product shape trademark holder whose product shape does in fact identify the product's source should not be precluded from

---

[1] The majority states, "Gibson's concession that there is no point-of-sale confusion (which goes to the fourth *Frisch* factor, actual confusion) is dispositive of Gibson's claim." I believe that what is dispositive of any trademark infringement claim brought on a theory of likelihood of confusion at the point-of-sale is not Gibson's concession of the fourth *Frisch* factor, which goes to evidence of actual confusion, but rather Gibson's concession that there is no likelihood of consumer confusion at the point-of-sale, which is the ultimate issue to which the *Frisch* factors are used as a guide to help address when analyzing a trademark infringement claim brought under a theory of likelihood of confusion at the point-of-sale.

[2] The last sentence of the post-sale confusion section reads, "[P]ost-sale confusion cannot serve as a substitute for point-of-sale confusion in this case." I view the post-sale confusion theory of relief not, when applicable, as serving as a substitute for point-of-sale confusion, but rather as a distinct theory of relief. When the alleged consumer confusion takes place at the point-of-sale, the ultimate issue is likelihood of confusion at the point-of-sale, in which the plaintiff will introduce evidence of point-of-sale confusion. However, when the alleged consumer confusion takes place in the marketplace (post-sale), then the ultimate issue is likelihood of post-sale confusion, in which the plaintiff introduces evidence of post-sale confusion.

[3] The majority, in footnote 15, explains that *PACCAR*'s discussion of initial interest confusion was specifically in reference to a dispute over internet-domain names. Obviously, as applied in that case, the doctrine's application related to a company's name trademark as used in an internet-domain name. All trademarks, whether they be a company's name, logo, or a product shape, do the same thing: they identify the source of a good. Since we (and many other circuits) have recognized the doctrine, the majority must explain why this recognized doctrine should not apply to trademarked product shapes. I find the majority's explanation unpersuasive.

presenting evidence that a competitor's product shape causes consumers to be attracted to it because of its similarity to a trademark holder's mark.

The majority's reason for rejecting the application of initial interest confusion to product shapes is based upon the concern that since many product shapes within the same category will appear similar when viewed from a sufficient distance, if the initial-interest confusion doctrine were applied to product shapes, a product shape trademark holder could prevent competitors from producing even dissimilar products that appeared from a sufficient distance to be somewhat similar to a trademarked shape. This concern, however, is misplaced. Evidence that a competitor's product shape is similar to a trademark holder's product shape when viewed from afar is irrelevant unless the product shape trademark holder maintains that its product shape identifies its source when viewed from afar. For if a product shape trademark holder does not assert that its product shape identifies its source when viewed from a certain distance, then any alleged confusion between the trademark holder's product shape and a competitor's product shape would not support the trademark holder's claim for infringement. If a product shape trademark holder does assert that its product shape serves to identify the product's source when viewed from a distance where many competitor products appear substantially the same, then this will be evidence that the trademark holder's product shape does not identify its source. If most product shapes in the same product category have similar shapes, a product shape trademark holder will have a difficult time establishing that its trademark identifies the source of its product when viewed from afar, for the further one is away from a product, the more similar products in the same category will look to each other and, thus, the less likely a product shape will identify the source of the product (i.e. serve as a trademark) from that vantage point.[4] In other words, a product shape trademark holder will not be able to present probative evidence of initial interest confusion unless it first shows that its product shape identifies its source when viewed from the vantage point where the confusion is alleged to have occurred.

Thus, this preliminary question (whether a product shape identifies its source when viewed from the point where the confusion is alleged to have occurred), when in dispute, as it is here, must be addressed before determining if there is an issue of fact as to whether a competitor's product shape causes initial interest confusion due to its similarity to a trademark holder's product shape.[5]

---

[4] The majority repeats its concern underlying its rationale for rejecting the application of initial interest confusion to product shapes in footnote 15 by noting that since many competing products will create initial interest due to their resemblance with a trademarked product shape when viewed from afar, a trademark product shape holder would be able to protect a "penumbra" of more or less similar shapes. If there exists a "penumbra" of products in the marketplace with shapes similar to a trademarked product shape when viewed from afar, then the trademarked product shape would likely fail to identify its source. If there does not exist a "penumbra" of products with shapes similar to a trademarked product shape when viewed from afar, and if the product shape does identify its source when viewed from that vantage point, and if the functionality doctrine does not prevent the application of the initial interest confusion doctrine when such confusion is alleged, then I believe a product shape trademark holder should be able to maintain a trademark infringement claim on the theory of initial interest confusion.

[5] The majority views this inquiry as "needlessly complicated and unworkable." I view it as essential. Since, as noted before, the purpose of every trademark is to identify the source of its good, if a trademark does not identify its source, a trademark holder cannot successfully prosecute a trademark infringement claim. If a product shape trademark holder believes that a competitor's product causes confusion as to its source due to the competitor's products resemblance to the trademark holder's product shape when viewed from a store's aisle or front-door, then the product shape trademark holder will need to establish that its trademark identifies its source when viewed from those perspectives for any evidence of such confusion to support its claim. Thus, the relevant observation distance or location for determining whether the trademark holder's product shape identifies its source is from whatever distance or location the trademark holder alleges confusion occurred.

It is true, of course, that a product shape trademark holder could argue that a competitor's product causes confusion as to its source when viewed from varying perspectives. Assuming the defendant argues that the trademark holder's product shape does not identify its source when viewed from any of those perspectives, the court will need to address this argument. In this case, the only relevant allegation of initial-interest confusion is from Gibson's expert, who

For if the product shape does not identify its source, then, logically, there can be no confusion as to the source of the product due to the product's shape, since, in such a case, a consumer would not associate the product's shape with its source.

Here, PRS argues that, as there are only a few general shapes in which guitars are made, and since there are numerous single-cutaway style guitars in the market, a consumer would not, and, indeed, could not, identify the source of a guitar on the basis of its shape. Although PRS would likely prevail on this issue, I cannot say, in light of the record as developed, that it has met its burden establishing that there is no genuine issue of material fact as to whether the shape of Gibson's guitar identifies its source.

Since the district court incorrectly analyzed the issue of whether Gibson's trademark served to identify its source from the distance where the confusion was alleged to have occurred, I would remand for consideration of this issue.[6] If it were found that the shape of Gibson's guitar does serve to identify its source from the distance where the confusion is alleged to have occurred, then I believe that Gibson should be entitled, just as any other trademark holder would be, to present evidence that a competitor's use of a similar mark causes confusion as to the source of the competitor's product.[7] Thus, I respectfully dissent.

---

claimed that upon entering Gruhn's Guitar store in Nashville, he looked at what he thought was a wall of Gibson Les Paul guitars to discover, upon closer inspection, that the guitars were actually PRS Singlecuts. Since PRS argues that Gibson's guitar shape does not identify its source, Gibson must establish that its shape does identify its source from the perspective where the alleged confusion occurred. Ultimately, Gibson may not be able to succeed in establishing this point, but PRS has not met its burden to be entitled to summary judgment.

[6] The district court made two fundamental errors with respect to its analysis of this issue. First, the district court improperly considered factors beyond the shape of Gibson's guitar, such as knob placement and color, in determining that Gibson's trademark identified its source, since Gibson's trademark consists only of the shape of the guitar. And second, the district court improperly concluded that since evidence of widespread use of similar marks "is not sufficient to rebut as a matter of law the presumption" that an incontestable mark identifies its source, such evidence "does not warrant further consideration." 311 F. Supp. 2d 690, 718. Rather, this evidence, which goes to the heart of the issue of whether Gibson's shape can identify its source, deserved significant consideration, even if such evidence were found not to be sufficient as a matter of law to establish that Gibson's mark does not identify its source.

[7] If the initial interest confusion doctrine were not applicable to product shape trademarks, I believe that product shape trademark holders would be put to a significant disadvantage compared to non-product shape trademark holders since this type of confusion is likely the only type of confusion that could arise with product shapes. It will be the rare case for there to exist a likelihood of confusion with respect to product shape trademarks at the point of sale since any confusion created by a product's similar shape will be dispelled at the point of sale, as most products will have a distinguishing feature that is identifiable from this vantage point, such as its producer's name. Thus, if initial interest confusion were not a viable theory upon which a product shape trademark holder could proceed, a product shape trademark holder may be quite limited, if not foreclosed, from successfully prosecuting a trademark infringement claim.